Case number 18-5232 Grand Canyon Trust Appellant v. David Lonely Bernhardt Secretary of the Interior in his official capacity at APP Mr. Kinney for the Appellant Mr. Clanton-Roth for the Appellant Good morning and may it please the Court. My name is Matt Kinney representing Appellant Grand Canyon Trust and I'd like to reserve two minutes for rebuttal. This case presents the question of whether a plaintiff in a Freedom of Information Act suit prevails and is thus eligible for attorney fees, where the facts show an accelerated document of production after a suit was filed, after the agencies admissed both statutory and then promised deadlines after the Grand Canyon Trust attempted to secure the requested documents before the suit was filed. Now the standards plaintiffs must meet in this case is whether it's more probable than not that the suit accelerated production. It does not require absolute proof. That was the standard below, but on review, the district court ruled against you on that issue. So on review, you have to show that finding is clearly erroneous. Well, this Court has held that the review of the eligibility prong is a de novo review and it's not unlike perhaps, say, a summary judgment where you have a set of facts and you're applying it to legal standards. We have one series of cases that loosely say eligibility determinations are reviewed de novo. We have another set of cases that say they are reviewed for clear error. But when you drill down and look at what's going on, every case that I could find where the specific issue before the court was causation or not under the catalyst theory, we reviewed for clear error. And all of the cases that you rely on that say de novo, the issue before the court is really something else. Well, one, I would say that even if the review is for clear error, that we prevail. Because one of the things the district court did here, especially in relying on Senator Kyle's remarks in the legislative history, was to view the element of eligibility through the lens of, well, we really shouldn't punish an agency who acts quickly or settles a case, whereas the language of the amendment, as well as the legislative history, say exactly the opposite, that no, you know, the committee report describes this exact situation where the agency fails. Let's talk for a minute about the language of the amendment, which you just mentioned. Will you show me in that language where there is a requirement that you even have to prove causation? Well, I would agree with you, Your Honor. There's no language in there saying it. It says that the government's change of position has to be voluntary, which doesn't sound like it's being caused by you. And second of all, the only other requirement is that your complaint not be insubstantial. So that seems to me to read out of any of you. I know we've got precedent, but it seems to me to read out a requirement that you even show causation. And that makes good sense, because under the government's theory here, how do you prove causation? What do you do? And you mentioned this. Take depositions of the government's attorneys and ask them why they changed their position and decided to give up. I mean, it's all attorney-client privilege. I think that's absolutely true. And at least in some of these cases where you have a finding of no causation, the agency at least filed declarations from the agency personnel. Can we go back on the causation problem? Your brief says and your brief said below that you have to prove causation. You don't disagree that that's what you have to prove? Well, I would agree with Judge Randolph that the statute when it was amended I'm not asking that. I'm asking what you argued below and what you argued to us in the brief, not what you're arguing now in response to Judge Randolph's question. You argued you have to prove causation, and you argued that you did prove causation. Is there any place in any pleading where you argued that you had no need to plead causation at all? No, Your Honor. I recognize the language of the cases of this Court which said that the 2000 amendment undid the Buchanan removal of causation and so reinstated it, which I think is true generally. So, you know, I didn't really feel free in the briefs to argue that because and also we did show sufficient causation. A panel can't overrule it. But I do think it's a larger question that should be addressed because the language itself does not talk about causation. It just talks about unilateral change in position. Now, if the agencies had been planning the pace, you know, as to whether we did show causation or not, the pace of production, they could have told the plaintiffs before they filed suit that we actually asked the agencies, okay, you've missed these deadlines. Can you please tell us when you're going to produce? And the BLM refused to say, and the Office of the Secretary said, well, it's going to be at least two months or whenever our lawyers get around to it. Can I just say this is a question about fact, if I have the facts correctly. So in October 2016, BLM predicted it would take about a year, right? Yes. And it did take about a year, including after you filed your lawsuit. It took less than a year, I guess. It took less than a year. It took slightly less than a year, right? A couple months less than a year. So it's within its prediction about a year. It's within the time it predicted before the lawsuit. I would say not, because, you know, the deadlines under Freedom of Information Act are 30 days, and that was two months quicker than they said. I'm not asking about the deadlines. I'm asking about you said that they refused to give you any prediction, and I understand the fact to be that BLM said, and this is reported in the defendant's answer, which I do not understand either to be disputing, paragraph 54. Defendants admit that on or about October 10, 2016, the BLM spoke with the plaintiff by telephone and said it would take roughly one year to finalize the plaintiff's response, right? Yes. That's right. And that was before you filed the lawsuit. That was before we filed the lawsuit. And after you filed the lawsuit, it was, in fact, produced within one year from roughly one year from October 2016. Well, they said it was going to take at least a year. So we have to show that the lawsuit sped up production. I think that shows. This one says it would take roughly one year. The at least part comes to the Office of the Secretary. I'm only reading from the paragraph 54 of the answer. Is there a different? This is a telephone call. Is there some other memorization of the telephone call or anything? There's none. Okay. So with respect to the Office of the Secretary, that is in your complaint, paragraph 43. And that's the one that on May 3, 2017, the Office of the Secretary informed the trust that it would require at least two months to complete its review, also stated the review probably would take much longer. And how long did it take from May 3, 2017? It was three to six weeks after the complaint was filed on May 9, so add another week to that. So it was released. The last document was released in June of 2017, June 13. The statement was made in May, so it's about a month and a half, right? Yes. Which I think shows an accelerated production. They said at least two months and whenever our lawyers get around to it. And it was two months, as I recall. This was just a telephone call, right? Yes, you're right. So maybe parsing it is not the best way to approach it. But I thought it was two months plus whatever time it takes our attorneys to review. That's right, Your Honor. It was. I'm just reading again just from your complaint since that's the only information we have. Also stated that the review probably would take much longer because the Office of the Secretary could not dictate the work schedule of its attorneys. Yes. And they withheld. At that point, we were withholding about 8,000 documents. Yeah, before the suit was filed, you know, one agency produced 12 documents. The other produced 220.  Right. And we got a supplemental filing from the government which said, well, the reason we did that or suggested the reason we did it is because of the possibility that there were third parties that had an interest. But the third parties only had a couple hundred documents, right? Right. That was just a small segment of the documents that had to go through clearance to the coal companies that submitted it to the agency. Right. So that doesn't explain the withholding of 8,000 or whatever it was. Yes. And I see we only have one minute left. I'd like to reserve it for rebuttal. Well, can I just ask, do you have any case where the change in position is just an accelerated production? Well, the case is... And then under the threat of litigation through a judicial order they produce. I mean, that's a common occurrence, but I would say it's probably even more common that you have these sort of deadline suit where the failure to provide the documents at all. Right. I mean, what does the case law say about when? Let's just assume I agree with the chief judge's suggestion that this is at most a moderate acceleration of a predicted deadline that was made under a high degree of uncertainty. It's not clear to me that that qualifies as a change in position because they do slightly better than they thought. We discussed it in our briefs, but the Tarrant case and the Epic case both describe an acceleration as a change in position. Those are both district court cases? Those are both district court cases. Are there any court of appeals cases? I know there aren't any in ours. Are there other circuits? Right. I would say from the public citizen health research group of this court from 1990, it's an EJID case, Equal Access to Justice Act, but it talks about acceleration of regulation, promulgation being enough. Is that a case about the definition of prevailing party or about discretionary authorization? No, it's prevailing party. The Equal Access to Justice Act uses similar language in terms of saying prevailing party. Thank you. More questions? No. All right. Good morning. Peter Fafenroth for the government. As the Court recognized, the burden is on the plaintiff, and it is binding law in this circuit that there is a requirement that the plaintiff prove causation. And the first question is, would ñ was the lawsuit necessary for the documents to be released? And the second question is, is there a causal nexus between some action of the plaintiff through the litigation and the government's change in position? And respectfully, the plaintiff fails at the first step, but also additionally fails at the second step. There was ñ everything that happened in this case would have happened administratively if it had simply been allowed to play out. If we put aside the precedent, and I realize that's a big if, but where, just as an original matter, where do you get the causation requirement from the statute itself? The legislative history. The statute itself. The statute itself. The statute itself says, if not insubstantial, if the claim is not insubstantial. And that actually, I think, supports both the notion that the district court should have discretion, and secondly, along the lines of Pierce from the Supreme Court in the AJA context, and secondly, is not insubstantial. What's added to the statute in order to ensure that it is not a, you know, a default, that fees are awarded? Well, that just, the not insubstantial is just an assessment of the merits of the claim. It doesn't go to why the documents were released, whether because of the litigation or for some other reason. Well, I think it's sufficiently broad, and it really is not defined in the context of the statute, but it's sufficiently broad to encompass the notion that the lawsuit was not, in fact, necessary for the release of the records. There are many contexts in which a lawsuit is necessary and does precipitate a change. For instance, where a ---- You can give us examples, would you? Yes. But how can you, I don't understand your answer, that you determine whether a lawsuit is necessary on the basis of what? On the basis of whether or not on the record it appears that but for the lawsuit things would have turned out the same way. Where's the but for? I just, I don't get it. But let me follow up. You said, well, they would have gotten these documents in the normal course because when the administrative process played out. How do we know that? We know that from the fact that the agency was clearly acting in good faith by being in regular contact with the requester from day, I think one of them responded, three days after the request came in. Yeah, but how do we know that the agency was acting in good faith as opposed to dragging its feet? The agency, you know, unfortunately. Deadlines were, you know, within the Office of the Secretary, there's one deadline after another that was missed. What's the reason for that? Why were the deadlines missed? As the record shows, there was, I believe on March 20th, the records were ready to go as far as the FOIA staff were concerned, but they had gone to the Office of the Solicitor for preclearance review. And that review actually added value because, for instance. Who in Interior decided to finally disclose the documents on the date that they were disclosed? The department? I mean, I don't have a name. I have the release letters here, Your Honor, and those would be the person on the FOIA staff who signed those release letters is responsible for the release. Was it the director of BLM that made the decision? So the solicitor? These are the agencies themselves. Typically their chief information officer, the person signing on behalf of BLM, is Cynthia Moses-Ned, the acting chief of the Division of Intergovernmental and External Affairs. Did we know what her reason was for disclosing the document in the time that she did? We don't. We know, based upon a very substantial record, that the records had to go through multiple levels of review, including line-by-line review. My question is, do we know why she disclosed the documents on the date that she did this, that they were turned over? Do we know why on that date? Because they were ready to go on that date. The record suggests that they were, you know, they were done. They released them and, for instance, BLM released three tranches, one in June, one in July, and one in August. What if she said, well, you know, we've got this lawsuit and we don't want to waste our resources defending this lawsuit, so let's get these documents out before the judge has to issue any kind of orders or judgment? What if that were her reason? I'm not going to speculate, Your Honor. There's nothing in the record to suggest that. Well, there's nothing in the record to suggest otherwise, is there? To the contrary, Your Honor. BLM received the request, I believe, on August 1st, 2016? August 2nd. And BLM acknowledged receipt on August 16th, 2016. And then in October, on October 10th, BLM told the trust it would take roughly one year to complete the FOIA request. By the way, they didn't say in October that it would take roughly one year from October. There's nothing in the record to support that reading. To the contrary, typically agencies gauge their release time from when they actually receive the request. So the release was made finally from the BLM records on August 31, 2017, which was Go ahead. Put aside BLM. Yes. What if it's what about the Office of the Secretary? If the Office of the Secretary accelerated production after missing deadline after deadline, then isn't that enough to warrant attorney's fees? Respectfully no, Your Honor. Unfortunately, processing a vast number of records takes a lot of time. And things come up particularly when you get lawyers involved. For instance, we see the exemption for outreach to the coal companies. And, in fact, exemption four was a withholding basis in the final tranche of Office of Secretary records that went out because at least one of the coal companies did object to the provision of such material. I mean, there were 8,000 documents or thousands of documents, and you're talking about a couple hundred. A lot of the withholdings were a deliberative process. Many of the withholdings were attorney-client privilege. There were also exemption six invocations in order to protect personal privacy. You know, this is a matter that was subject to substantial public comment. And so, you know, when the public is commenting, you know, we're not releasing the personal addresses of the commenters and the personal email addresses of the commenters. That does require line-by-line review.  And that takes real time. If you ask for all records about a substantial regulatory proceeding, that doesn't happen within 30 days or 20 days or 60 days. Yeah. I understand all that. And, therefore, the consequence of what you've just described, the over the burden on the agencies, I'm clearly aware of that, is that the agencies in determining what to produce and when have to prioritize. They have to set priorities. And maybe one of the ways they set priorities is if they have a lawsuit facing them. We'd better get that one out as opposed to spending time on the other couple thousand that we have in the piles on our desk. Your Honor, I get questions like that from agencies. And my advice to them is follow Open America and do it first in, first out, unless there's, you know, an expedition request that is granted. Because, otherwise, you do potentially become subject to fees. It's unfortunate, frankly, that as this Court has recognized, there are many incentives for people to come to court in order to try and jump the queue. But, you know, by virtue of doing that, agencies, it disrupts the entire process. And this Court recognized way back in 1976 in Open America the importance of fairness to all requesters by following a first in, first out approach. If the Court has nothing further, I'd ask that the decision be affirmed. We stole your extra minute, so we'll give it back to you. In fact, we'll give you two minutes. How's that? I just wanted to clear up something, Chief Judge Garland, that you asked about, and that was whether it was about a year or at least a year. The appendix, page 40, well, appendix page 15, paragraph 54, does say at least a year. So I just wanted to point that out. I don't know if I answered clearly. No, then I misread it. I'm sorry. Where did it say? The appendix, page 15. Which? It's from the answer, paragraph 54, appendix page 15. Paragraph 54? Yes. Is that what you're talking about? Yes. Well, I have it on appendix page 33, paragraph 54. It says it would take roughly one year. So we have a different one? I think it's appendix page 15. What's the difference between? It's one day. 33. This is the answer. Paragraph 54, the answer, right? Well, yes. So plaintiff said it would take at least a year, and the defendant said roughly one year. But it didn't, so. Okay. Anyway. We'll go with at least a year. Okay. Fair enough. I wanted to point out the status report at appendix page 40 where the BLM said that their search was still underway, which shows that they had not processed much of the request, at least. They were still searching for records by the time when the complaint was filed. And the Office of Secretary never made a prediction about when it would lawsuit was filed where they said at least two months or whenever its lawyers were ready to. But since the question is did the lawsuit cause it, isn't the right thing to ask what was the last prediction before the lawsuit? Right. So the last prediction before the lawsuit was at least two months and whenever our lawyers get around to doing it. And then the lawsuit was filed, and they were provided within three to six weeks of the lawsuit being filed. It didn't quite say whenever our lawyers get around to it. It said the review probably would take much longer because they would have to consult with the lawyers. Yes. I'm sorry if I used too much hyperbole, but I think that's roughly the same. It was giving no deadline. It was saying that it could have taken a year. We don't know, but we filed the suit, and then there you are with the production within three to six weeks. Okay. Any other questions? Thank you. Okay. Thank you. We'll take the matter under submission.
judges: Garland, Katsas, Randolph